# 05 MAG 1699

Approved: _AHSM_ (signature)

MIRIAM E. ROCAH / ALEXANDER H. SOUTHWELL
Assistant United States Attorneys

Before: HONORABLE ~~RONALD L. ELLIS~~ DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

DEFENDANT'S
EXHIBIT
50

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

    - v. -                          :

MUSTAFA OZSUSAMLAR and            :
OSMAN OZSUSAMLAR,
                                    :

        Defendants.           :

- - - - - - - - - - - - - - - - -x

**SEALED COMPLAINT**

Violation of
18 U.S.C. § 1958

COUNTY OF OFFENSE:
NEW YORK, NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

THERESA K. MCKEEVER, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Murder for hire)

1.     From in or about August 2005 through in or about October 2005, in the Southern District of New York and elsewhere, MUSTAFA OZSUSAMLAR and OSMAN OZSUSAMLAR, the defendants, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to travel in and cause another (including the intended victim) to travel in interstate and foreign commerce, and use and cause another (including the intended victim) to use the mail and any facility in interstate and foreign commerce, with intent that a murder be committed in violation of the laws of any State and the United States as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, to wit, money.

(Title 18, United States Code, Section 1958.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

2.     I am a Special Agent with the Federal Bureau of

Theresa McKeever

3502-6

Investigation ("FBI"), and have been so employed for approximately 7 years.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my conversations with other law enforcement agents and witnesses, my examination of reports and records, and my personal participation in the investigation of this matter.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.    I have spoken with another FBI agent who was the case agent (the "Case Agent") in charge of a prior prosecution in this District of MUSTAFA OZSUSAMLAR, the defendant, who informed me that:

a.    MUSTAFA OZSUSAMLAR was convicted after a jury trial in this District, in or about May 2004, of numerous bribery, identification document fraud, and unlawful transportation of illegal aliens charges, relating to his participation in a conspiracy to bribe a public official to fraudulently provide identification documents to illegal aliens. OZSUSAMLAR had previously been convicted in or about September 1995 after trial in the District of New Jersey of numerous immigration and naturalization offenses stemming from his running of a Turkish alien smuggling ring, and his holding a woman hostage at his home in Paterson, New Jersey.  MUSTAFA OZSUSAMLAR is currently awaiting sentencing on his May 2004 convictions and is detained at the Metropolitan Correctional Center ("MCC") in Manhattan.

b.    Prior to his arrest on the charges which led to the May 2004 convictions, MUSTAFA OZSUSAMLAR and his son, OSMAN OZSUSAMLAR, the defendant, lived in Paterson, New Jersey.  In addition, based on database information, I have learned that OSMAN OZSUSAMLAR still resides in Paterson, New Jersey.

4.    In or about September 2005, I met with a cooperating witness (the "CW") who is currently incarcerated at the MCC on various fraud charges, including the use and possession of stolen securities, bank fraud, and access device fraud.  The CW recently began cooperating with the Government and is in the process of entering into a cooperation agreement with the Government.  I and other FBI agents have met with the CW on a number of occasions to debrief him about his criminal activity and statements made to him by MUSTAFA OZSUSAMLAR, the defendant.  The CW's information

has proven to be accurate and reliable, and has been corroborated by other evidence, including the recorded conversations described herein. From the CW, I learned the following:

a.    In or about August 2005, MUSTAFA OZSUSAMLAR, with whom the CW is imprisoned at the MCC,[1] approached the CW and told the CW about a man (outside of jail) who owed OZSUSAMLAR approximately $283,000.  MUSTAFA OZSUSAMLAR further asked the CW whether or not he knew of someone who could kill the person who owed him the money (the "Victim").  MUSTAFA OZSUSAMLAR also told the CW that the Victim's children could be kidnaped and said he would pay the killer 10% of the money collected from the Victim. MUSTAFA OZSUSAMLAR also told the CW that one of his (OZSUSAMLAR's) sons had already gone to the Victim's office and given the Victim two weeks to repay the debt.  The CW (falsely) told OZSUSAMLAR that he was interested in this job.

b.    On or about August 26, 2005, MUSTAFA OZSUSAMLAR gave the CW a piece of paper with handwritten information on it. The information included the name of the Victim, the Victim's wife, and their business address.  The paper that MUSTAFA OZSUSAMLAR provided to the CW also contained the name of one of MUSTAFA OZSUSAMLAR's sons in Turkey and had the amount "$283,000," written on it, which was supposedly the amount of money owed by the Victim.[2]  Subsequently, the CW told MUSTAFA OZSUSAMLAR that he had relayed the information regarding the Victim, and instructions on what MUSTAFA OZSUSAMLAR wanted done to the Victim, to one of his associates outside of jail.

c.    On or about August 31, 2005, MUSTAFA OZSUSAMLAR told the CW that he was trying to transfer out of the CW's unit at the MCC because he did not want to be near the CW when the CW's people finalize their plans regarding the Victim.

5.    Pursuant to a Grand Jury subpoena, I have obtained recordings of telephone calls from the MCC made by MUSTAFA OZSUSAMLAR, the defendant, and his list of callers, which

---

[1]    In or about September 2005, the CW identified a photograph of MUSTAFA OZSUSAMLAR, the defendant, from a photo array, as the individual who approached him about this matter.

[2]    The CW provided this piece of paper to me in or about September 2005.  It lists the name of the Victim and his wife, their business address (which another agent has confirmed, as described below), and the name of one of MUSTAFA OZSUSAMLAR's sons (confirmed to me by the Case Agent).

3

includes a phone number with a New Jersey area code which I know to belong to OSMAN OZSUSAMLAR, the defendant (the "New Jersey phone number").[3]  I have had certain telephone calls made by MUSTAFA OZSUSAMLAR at the MCC to OSMAN OZSUSAMLAR at the New Jersey phone number translated from the Turkish language and transcribed.  Summarized below are several telephone calls between MUSTAFA OZSUSAMLAR and OSMAN OZSUSAMLAR made in or about August 2005.

      a.  On or about August 20, 2005, MUSTAFA OZSUSAMLAR asked OSMAN OZSUSAMLAR whether he had obtained  the address of the Victim's wife, and instructed OSMAN OZSUSAMLAR to bring the address to him on his prison visiting day.

      b.  On or about August 22, 2005, MUSTAFA OZSUSAMLAR and OSMAN OZSUSAMLAR discussed the Victim's address.  OSMAN OZSUSAMLAR told MUSTAFA OZSUSAMLAR that he had the Victim's business address and had sent it to MUSTAFA OZSUSAMLAR, but that he could not find the Victim's home address.

      c.  On or about August 29, 2005, MUSTAFA OZSUSAMLAR and OSMAN OZSUSAMLAR again discussed the Victim's address.  OSMAN OZSUSAMLAR told MUSTAFA OZSUSAMLAR that the Victim and his family were living at the business address.

6.  I have spoken with another FBI agent who has been acting in an undercover capacity as the CW's associate ("UCA"). The UCA is pretending to arrange for the collection of the debt and for the Victim's murder.  I learned from the UCA, as well as my surveillance of the UCA, that on or about September 8, 2005, the UCA went to the Victim's business at the address provided to the CW by MUSTAFA OZSUSAMLAR, the defendant, (referenced above in paragraph 4(b)) and spoke to the Victim and the Victim's wife, telling them that he was there because of the approximately $283,000 that they owed MUSTAFA OZSUSAMLAR.  The Victim's wife told the UCA that the amount they owed MUSTAFA OZSUSAMLAR was actually around $50,000 and that they had only borrowed $150,000. The UCA asked the Victim and his wife to gather proof of the amount they repaid to MUSTAFA OZSUSAMLAR and that the UCA would be back in touch.

7.  On or about September 13, 2005, I met again with the CW

---

[3] Telephone records show that the number was subscribed to OSMAN OZSUSAMLAR.  In addition, OSMAN OZSUSAMLAR gave this phone number to the undercover FBI agent utilized in this case, as explained below.

and instructed the CW to tell MUSTAFA OZSUSAMLAR, the defendant, that the CW's associate had contacted the Victim and that someone (who was not in prison) had to call the CW's associate about payment for the job.  I also provided the CW with a phone number for the UCA (the "UCA Phone Number") and a name for the UCA ("Joe") to give to MUSTAFA OZSUSAMLAR.

8.    On or about September 19, 2005, I met again with the CW, who told me he had given the UCA Phone Number and the name "Joe" to MUSTAFA OZSUSAMLAR, the defendant, and that he had told MUSTAFA OZSUSAMLAR that someone from outside of jail had to call "Joe" about payment for the job.  The CW observed MUSTAFA OZSUSAMLAR write down the UCA Phone Number on a piece of paper which MUSTAFA OZSUSAMLAR kept in his Koran.  MUSTAFA OZSUSAMLAR indicated that he would call his son with this information and offered to pay the CW's associates more than 10 percent of the debt collected from the Victim as a fee for collecting the debt and arranging the Victim's murder.

9.    Summarized below are additional telephone calls made by MUSTAFA OZSUSAMLAR from the MCC to OSMAN OZSUSAMLAR at the New Jersey phone number, that I had translated and transcribed.

a.    On or about September 16, 2005, MUSTAFA OZSUSAMLAR informed OSMAN OZSUSAMLAR that he (MUSTAFA OZSUSAMLAR) had found someone to solve "that problem" and gave OSMAN OZSUSAMLAR the name "Joe," and the UCA Phone Number.  MUSTAFA OZSUSAMLAR also told OSMAN OZSUSAMLAR not to call "Joe" from OSMAN OZSUSAMLAR's own phone.

b.    On or about September 16, 2005 (later in the day), MUSTAFA OZSUSAMLAR asked OSMAN OZSUSAMLAR whether he had made the call (meaning the call to "Joe").  OSMAN OZSUSAMLAR told MUSTAFA OZSUSAMLAR that he had tried twice but that no one had answered the phone when he called.  MUSTAFA OZSUSAMLAR further told OSMAN OZSUSAMLAR that when he called them (meaning "Joe"), OSMAN should tell them ("Joe") that he is "Mustafa's son" and that he is with the CW (who MUSTAFA OZSUSAMLAR mentioned by name).

10.    I also learned from the UCA, as well as from surveillance of the meeting described below and listening to a recording of the September 30, 2005 phone call and meeting described below, that:

a.    On or about September 17, 2005, the UCA received a telephone call from OSMAN OZSUSAMLAR, the defendant, who told the UCA that he was calling for MUSTAFA OZSUSAMLAR, the defendant, and that he was MUSTAFA OZSUSAMLAR's son.  The UCA told OSMAN

OZSUSAMLAR that he did not want to talk over the phone and they arranged to meet in person the next day.

b.   On or about September 18, 2005, the UCA, wearing a body recording device, met OSMAN OZSUSAMLAR at a coffee shop in Manhattan and they then stepped outside to talk.   OSMAN OZSUSAMLAR asked the UCA whether he had met the Victim's wife, to which the UCA responded that he had, but that she had claimed to owe only $50,000 to OSMAN OZSUSAMLAR and his father.   OSMAN OZSUSAMLAR responded that there were two loans and that the Victim's wife owed him $50,000 and owed MUSTAFA OZSUSAMLAR approximately $280,000.   The UCA said that he had people to take care of the situation, that he wanted to keep his hands clean, and understood that he would get 10 percent of the debt collected from the Victim.   OSMAN OZSUSAMLAR agreed and said that his father had to pay the CW 10 percent, but that he would be willing to pay another 5 percent to the UCA.   OSMAN OZSUSAMLAR also told the UCA that it was important to collect the debt first (meaning before the Victim was killed).   When the UCA asked OSMAN OZSUSAMLAR if he should take care of the Victim (meaning kill the Victim) after collecting the debt, but leave the Victim's wife alone, OSMAN OZSUSAMLAR responded that it did not matter.   OSMAN OZSUSAMLAR further told the UCA that his father wanted the money wired to Turkey, but that he (OSMAN) preferred cash.   The UCA and OSMAN OZSUSAMLAR also discussed the location of the Victim's home and OSMAN OZSUSAMLAR told the UCA to be careful because the building next door might have surveillance cameras and the local police department was not too far away.   The UCA also confirmed that the important thing was getting the money first and then getting rid of the Victim afterwards with no trace, to which OSMAN OZSUSAMLAR laughed and responded affirmatively.

c.   On or about September 30, 2005, the UCA received a telephone call from OSMAN OZSUSAMLAR and they further discussed the plan to kill the Victim.   Specifically, the UCA told OSMAN OZSUSAMLAR that "his people" would make it look like a robbery and would "kill" both the Victim and the Victim's wife.   The UCA then asked OSMAN OZSUSAMLAR if he understood, to which OSMAN OZSUSAMLAR responded affirmatively.   The UCA and OSMAN OZSUSAMLAR also made arrangements for the UCA to call OSMAN OZSUSAMLAR when the situation had been handled.

WHEREFORE, deponent prays that arrest warrants be issued for MUSTAFA OZSUSAMLAR and OSMAN OZSUSAMLAR the above-named defendants and that they be arrested and imprisoned, or bailed, as the case may be.

OCT 0 6 2005

THERESA K. MCKEEVER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
6 day of October, 2005

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK


DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

7

May 7, 2007

Rothman, Schneider
Soloway & Stern, LLP
100 Lafayette St suite 501
New York, NY 10003

Judge Peter K. LEISURE
USDC - SDNY
500 Pearl St Room 1910
New York, NY 10007

Re: USA V. OZSUSAMLAR
S1 05 Cr 1077 (PKL)

Dear Mr. Soloway and Judge Leisure,

On May 3, 2006 and August 9, 2006 thi
Honorable Court did advized me to get not sent to
Court any more letters. My letters are the only thing
gatting to truth.

I make all my arrangement to get information
on my own. I tell you again this exemple.

At Court last week I give my Attorney my
motion and objection to my PSR It very detailed writt
many pages. This week, Attorney mail me an old cap,
of the PSR and tell me to respond to him very soon
if there are any mistakes in PSR It's dated After we
met in Court! That very stupid and lazy.

I still not have my 3500 material for informatio
up to December 30, 2006. Judge Leisure order the
forensic report that Osuna not get. It clear to me
Judge Leisure get money from Osuna to keep me
here in prison.

I not write any more. It not doing any good—

My appeal come back I get honest people then. I have friends now who are going to get information an all of you and get even for me May 13 is comming soon.

Sincerely

cc: File
: AUSA Ms. Rocha.

Osman Ozsusamler
#53271-054
MDC- Brooklyn
P.O. Box 329.002
Brooklyn, N.Y. 11232

Page ② of ②

APR-13-2007  15:15          FEDERAL DEFENDER                    212 571 0050

Osman, we need to be Clear There will
be no Communication from this. write my
start description of the Rele you want to
Put down;

/ FBI    Agent /                  5'8" Stocky strong Build
+ John F Camparella. SSA.
+ Melvin F Bailey.
- Theresa McKeever.
- Christopher Petreseller.
- Michael Linder.

AUSA
    Miriam Rocha
    Alexander Southwell

    Case Court Reporter   Office

    Forensic lest Company

                                        Ihsan Askin.
Lawyer                                  201-8736257.
    Joyce London
    Robert Osuna

    Betcars   Man check Cashing - Patterson, NU
                Ditek - 35 $                      07505
                Murat - 35 $
    Siblass   2 brothers - 1.5 after
              One other ofthere in PA

    $50,000 of Loan @ 32% per year Compound slow?%
    $500,00 with Loan Balance

TOTAL P.005

APR-13-2007   15:14        FEDERAL DEFENDER

(3 days.                    - 3500.
                           - forensic.

(1)

        (1) murder for hire           cospricy
        (2)
        (3) extion.

                            2007
        (C)  108.           2001
                              6

        Muhammed  →  SSt John  Comperale
St Agen  Melvin Bailey
St  Mc Keever  →  White Crime  Queens  SQ 12
        Linder.
(1) Manhattan
(2) Murder.  SQ 20.
(3)

Rawson  NJ.        Federson  NJ

my hand writing.

28 C.F.R

**§ 8.12 <u>Retaliation</u> for Exercising Constitutional Rights**

A corrections officer warned a prisoner that if he did not become an informant, bad things would happen to him, including transfer to a less desirable part of the prison. The prisoner reported the alleged threat by a letter addressed to a United States District Judge who was presiding over pending prison litigation. As a result, the prisoner was issued a disciplinary charge for defiance. The constitutional right of access to the courts was violated by this retaliation.[116]

The necessary elements of a **retaliation** claim are: (1) a prison official acting under color of state law; and (2) intentional **retaliation** for the exercise of a constitutionally protected activity. The law is clearly established that a prison official may not retaliate against or harass a prisoner for exercising the right of access to the courts.[117] Even the prison officials candidly conceded that this was a claim of constitutional proportions that is actionable. Further, the court determined that there was no immunity defense.

To state a claim of **retaliation**, a prisoner must allege the violation of a specific constitutional right and be prepared to establish that, but for the retaliatory motive, the incident would not have occurred.[118] This places a significant burden on the prisoner. Mere conclusory allegations of **retaliation** will not withstand a summary judgment challenge.[119] The prisoner must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which **retaliation** may plausibly be inferred.

The Fifth Circuit in *Woods v. Smith* remained fully supportive of the proposition that although prison officials must have wide latitude in the control and discipline of prisoners, such latitude does not encompass conduct that infringes on a prisoner's substantive constitutional rights. However, the court agreed with the Fourth Circuit when it cautioned that the prospect of endless claims of **retaliation** on the part of prisoners would disrupt prison officials in the discharge of their most basic duties and that claims of **retaliation** must therefore be regarded with skepticism, lest the federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.[120]

Prison officials applied a policy in a way that discriminated against prisoners on the basis of the content of their legal materials. The real motive of the prison officials, who prevented third-party legal materials from being delivered, was to suppress materials that embarrassed the Department of Corrections and educated prisoners on how to file their claims.[121]

Constitutional Rights of Prisoners                    1

© 2014 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

53271054



UNITED STATES GOVERNMENT
# MEMORANDUM
METROPOLITAN DETENTION CENTER
BROOKLYN, NEW YORK

**DATE:**   June 25, 2007

**REPLY TO ATTN OF:**   Cameron Lindsay, Warden

**SUBJECT:**   Special Administrative Measures
Pursuant to 28 C.F.R. §501.3 (c)

**TO:**   Inmate OZSUSAMLAR, Osman
Register No.:53271-054

Pursuant to 28 C.F.R. §501.3 (c), Special Administrative Measures (SAM) are being implemented regarding your confinement. The Bureau of Prisons adopted these special administrative conditions based on information of your proclivity for violence. There is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. Therefore, you are restricted in access to the mail, the media, the telephone and visitors. This SAM will commence immediately upon notice to you and will be effective for the period of one year.

## SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3 (c)
Inmate - Osman Ozsusamlar ("Ozsusamlar" or "inmate")

1.   <u>General Provisions:</u>

   a.   **Adherence to Usual United States Marshal Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

   b.   **Interim SAM Modification Authority -** During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify

-1-

your SAM as long as any SAM modification authorized by OEO:

    i.    does not create a more restrictive SAM;

    ii.    is not in conflict with the request of the U.S. Attorney for the Southern District of New York (USA/SDNY), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations; and

    iii.    is not objected to by the USA/SDNY, FBI or USMS/BOP/DF

c.    **Inmate Communications Prohibitions** - You are limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in your communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) information relating to criminal information.

d.    **Use of Interpreters/Translators by USMS/BOP/DF-** Translator Approval Requirement:

    i.    USMS/BOP/DF may use Department of Justice (DOJ) approved translators as necessary for the purpose of facilitating communication with you.

    ii.    No person shall act as a translator without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/SDNY.

    iii.    Translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Translators shall not be alone with you, either in a room or on a telephone or other communications medium.

2.    **Attorney/Client Provisions:**

    a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - Your

---

[1] The term "attorney" refers to your attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one (1) attorney where you are represented by two (2) or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

attorney (or counsel) – individually by each if more than one (1) – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, your attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, your attorney, and pre-cleared staff, acknowledge the restriction that they will not forward third-party messages to or from you.

a.   The USA/SDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

b.   After initiation of SAM and prior to your attorney being permitted to have attorney/client-privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/SDNY.

c.   The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

b.   **Attorney Use of Interpreters/Translator:**

i.   Necessity Requirement - No interpreter/translator ("translator") shall be utilized unless absolutely necessary where you do not speak a common language with your attorney. Any translator shall be precleared..[2]

ii.  Attorney Immediate Presence Requirement - Any use of an interpreter by your attorney shall be in the physical and immediate presence of your attorney – in the same room. Your attorney shall not patch through telephone calls or any other communication, to or from you.

iii. Translation of Your Correspondence - An attorney of record may only allow a federally-approved translator to translate your correspondence as necessary for attorney/client-privileged communication.

---

[2]"Precleared" refers to a translator who is actively assisting your attorney with your defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of your SAM and has agreed -- as evidenced by his/her signature -- to adhere to the SAM restrictions and requirements.

c.    **Attorney/Client Privileged Visits -** May be contact or non-contact, at the discretion of the USMS/BOP/DF.

d.    **Attorney May Disseminate Your Conversations -** Your attorney may disseminate the contents of your communication to third parties for the sole purpose of providing necessary legal services related to your defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by your attorney, and not by your attorney's staff.

e.    **Unaccompanied Attorney's Precleared Paralegal(s)[3] May Meet With You -** Your attorney's precleared paralegal(s) may meet with you without the necessity of your attorney being present. An investigator or translator may not meet alone with you. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.    **Simultaneous Multiple Legal Visitors -** You may have multiple legal visitors provided that at least one (1) of the multiple legal visitors consists of your attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.    **Legally Privileged Telephone Calls -** The following rules refer to all legally-privileged telephone calls or communications:

    i.    *Your Attorney's Pre-cleared Staff May Participate in Your Telephone Calls -* Your attorney's pre-cleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

    ii.    *Your Initiation of Legally-Privileged Telephone Calls -* Telephone calls to your attorney or pre-cleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney. This privilege is contingent upon the following additional restrictions:

        (1)    Your attorney will not allow any non-precleared person to

---

3     "Precleared" when used with regard to your attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator, who is actively assisting your attorney with your defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of your SAM and has agreed -- as evidenced by his/her signature -- to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

communicate with you, or to take part in and/or listen to or overhear any communications with you.

(2)     Your attorney must instruct his/her staff that:

(a)     Your attorney and pre-cleared staff are the only persons allowed to engage in communications with you.

(b)     Your attorney's staff (including your attorney) are not to patch through, forward, transmit, or send your communications to third parties.

(3)      No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a)     Is to be overheard by a third party.[4]

(b)     Will be patched through, or in any manner forwarded or transmitted to a third party.

(c)     Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d.

(d)     Shall be in any manner recorded or preserved.[5] Your attorney may make written notes of attorney/client-privileged communications.

(4)     If USMS/BOP/DF, FBI or USA/SDNY determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

h.     **Documents Provided by Attorney to Inmate** - Your attorney may provide you with or review with you, documents related to your defense, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by your attorney, so long as any of the foregoing documents are translated,

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/Department of Justice (DOJ), or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client-privileged communications.

[5] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client-privileged communications.

if translation is necessary, by a pre-cleared translator. Any document not related to your defense must be sent to you via general correspondence and will be subject to the mail provisions of subparagraphs 2 i and 3g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

    i.    None of the materials provided may include inflammatory materials, materials inciting to violence or military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/SDNY and the FBI.

    ii.    The USA/SDNY may authorize additional documents to be presented to you. If any document not listed or described above needs to be transmitted to you, consent for the transmission of the document can be obtained from the USA/SDNY without the need to formally seek approval for an amendment to the SAM.

ii    **Legal Mail -** Your attorney may not send, communicate, distribute, or divulge your mail, or any portion of its contents (legal or otherwise), to third parties.[6]

    i.    In signing the SAM acknowledgment document, your attorney and pre-cleared staff will acknowledge the restriction that only your case-related documents will be presented to you, and that neither your attorney nor his/her staff will forward third-party mail to or from you.

3.    **Inmate's Non-legal Contacts:**

a.    **Non-legal Telephone Contacts -**

    i.    You are limited to non-legal telephone calls with your immediate family members, with the exception of your brother, Ramazan Ozsusamlar.[7]

    ii.    The quantity and duration of your non-legal telephone calls with your immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/SDNY to allow more calls.

---

[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from your attorney of record. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7] Your "immediate family members" are defined as your (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

b. **Rules for Telephone Calls -** For all non-legally-privileged telephone calls or communications, no telephone call/communication, or portion thereof:

    i.    Is to be overheard by a third party.[8]

    ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.    Shall be divulged in any manner to a third party.

    iv.    Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF- approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

c. **Telephone SAM Restriction Notifications -** For all non-legal telephone calls to your immediate family member(s):

    i.    USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

    ii.    USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify your communication recipient in English.

    iii.    USMS/BOP/DF shall document each such telephone notification.

d. **Family Call Monitoring -** All calls with your immediate family member(s) shall be:

    i.    Contemporaneously monitored by the FBI.

    ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

---

[8] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties. This section does not allow monitoring of attorney/client communications.

[9] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Non-legal Visits -**

    i.    **Limited Visitors -** You shall be permitted to visit only with your immediate family members, with the exception of your brother, Ramazan Ozsusamlar. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii.    **English Requirement -** All communications during your non-legal visits will be in English unless a fluent FBI, USMS/BOP/DF-approved translator is readily available to contemporaneously monitor the communication/visit.

    iii.    **Visit Criteria -** All non-legal visits shall be:

        (1)    Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        (2)    Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where you are housed.

        (3)    Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff should you attempt to take hostages.

        (4)    Limited to one (1) adult visitor at a time. However, your FBI-verified children may visit with a pre-approved adult visitor.

g.   **Non-legal Mail -** Any mail not clearly and properly addressed to/from your attorney and marked "Privileged" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, with the exception of your brother, Ramazan Ozsusamlar, U.S. Courts, federal judges, U.S. Attorney's Offices, members of U.S. Congredd, BOP, other federal law enforcement entities, and, if the inmate is a citizen of a foreign country, a verified consular representative of the country.

   i.   General correspondence with limitations: correspondence is restricted to only immediate family members, with the exception of your brother, Ramazan Ozsusamlar. Volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½ x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to you will be confirmed by USMS/BOP/DF and FBI.

   ii.   **General correspondence without limitations:** correspondence to U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities. There is no volume nor frequency limitation on mail to/from these parties unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

   iii.   All non-legal mail will be:

      (1)   **Copied -** Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which you are housed.

      (2)   **Forwarded -** Shall be forwarded, in copy form, to the location designated by the FBI.

      (3)   **Analyzed -** After government analysis and approval, if appropriate, your incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addressee (outgoing).

      The Federal Government will forward your non-legal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

-9-

       (a)     A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

       (b)     A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

       (c)     A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv.    **Mail Seizure -** If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4.    <u>**Communication With News Media:**</u>

    a.    You will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through your attorney, through a third party, or otherwise.

5.    <u>**No Group Prayer:**</u>

    a.    You shall not be allowed to engage in group prayer with other inmates.

    b.    If an FBI and/or USMS/BOP/DF-approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    <u>**No Communal Cells and No Communication Between Cells:**</u>

    a.    You shall not be allowed to share a cell with another inmate.

    b.    You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7. **Recording Conversations Between Cells:**

    a.     USMS/BOP/DF, and FBI are hereby authorized to place microphones in the hallways and elsewhere outside your cell to record any statements made by you to other inmates or staff.

    b.     The Notice of SAM given to you shall notify you that you are subject to such recording.

8. **Cellblock Procedures:**

    a.     You shall be kept separated from other inmates as much as possible while in the cellblock area.

    b.     You shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

9. **Commissary Privileges:**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

10. **Access to Mass Communications:**

To prevent you from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

    a.     **Periodicals/Newspapers -**

        i.     You may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the FBI, in consultation with the USMS/BOP/DF and USA/SDNY.

        ii.     Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to you.

        iii.     You shall then have access to the remaining portions of the periodicals/newspapers in accordance with USMS/BOP/DF policy, after a

        delay of at least thirty (30) days.  In accordance with subparagraph 3(g) above, the FBI will review the remaining portions of the publications prior to distribution to you and be responsible for any translations required.

    iv.    In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share the publication(s) with any other inmates.

    b.    **Television and Radio -** You are restricted from access to channels/stations which primarily broadcast news, but are permitted access to all other radio and television channels/stations, in accordance with USMS/BOP/DF policies.

    c.    **Termination or Limitation -** If the USMS/BOP/DF determines that the mass communications are being used to send messages to you relating to the furtherance of violent activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11.    **Frequent Cell Searches:**

    USMS/BOP/DF is hereby directed to search your cell frequently and to take appropriate disciplinary action for any infractions.

12.    **Transfer of Custody:**

    In the event that you are transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

    The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity.  Moreover, these measures are the least restrictive that can be tolerated in light of your ability to aid knowingly or inadvertently, in plans that create a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons.

    With respect to telephone privileges, the SAM is reasonably necessary because of the high probability of calls to co-conspirators to arrange criminal and violent activities.

    The SAM, with respect to mail privileges, is reasonably necessary to prevent you from receiving or passing along critically-timed messages.  While I recognize that eliminating your mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or assist

in, violent activities. Under this procedure, you can relate personal news to family members, even if delayed, but you may find it difficult or unwise to pass along restricted information in light of these procedures.

To the extent that the use of a translator is necessary, the government has the right to make sure that the translator given access to you is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if you advocate violent offenses, or if you make statements designed to incite such acts. Based upon your past behavior, I believe that it would be unwise to wait until after you solicit or attempt to arrange another violent act to justify such media restrictions.

The SAM's limitations on access to newspapers, publications, television and radio are reasonably necessary to prevent you from receiving and acting upon critically-timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. While I recognize that eliminating your access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns you may develop with the outside world, and ensure that the media is not used to communicate information which furthers violent and/or criminal activities.

I received a copy of the SAM dated June 25, 2007 (13 pages).

**OZSUSAMLAR, Osman**
**Register No. 53271-054**

-13-

MAMAY. 13. 2008  3:42PM     OEO/SDNY                              NO. 2436     P. 3

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

May 12, 2008

By Fax

Christine Thren
United States Department of Justice
Office of Enforcement Operations
Fax: (202) 616-8256

      Re:  Inmate Osman Ozsusamlar, USMS # 53271-054

Dear Ms. Thren:

      This Office has made the determination to terminate the
SAM restrictions previously imposed on inmate Osman Ozsusamlar.
Please let us know if you have any questions.

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney

                    By:  _____
                         Elie Honig
                         Assistant U.S. Attorney
                         (212) 637-2474

                                                    TOTAL P.002



U.S. Department of Justice

Federal Bureau of Prisons

---

*Office of the Director*

*Washington, DC 20534*
May 16, 2008

MEMORANDUM FOR RON WILEY, WARDEN
                 ADX FLORENCE, COLORADO

*Thomas R. Kane*

FROM:      *for* Harley G. Lappin, Director
             Federal Bureau of Prisons

SUBJECT:    Vacation of Special Administrative Measures
             pursuant to 28 C.F.R. §501.3 for inmate
             Osman Ozsusamlar, register number 53271-054

The Attorney General authorized the use of the provisions set
forth in 28 C.F.R. §501.3 (violence) for inmate Osman Ozsusamlar,
who is currently incarcerated at the ADX in Florence, Colorado.
The special administrative measures (SAM) restrict the inmate's
access to the mail, the media, the telephone, visitors, and his
communication with others.

Pursuant to the attached memorandum from the Director, Office of
Enforcement Operations, the SAM for inmate Ozsusamlar is vacated,
at the request of the U.S. Attorney's Office for the Southern
District of New York, based on input from the Federal Bureau of
Investigation.  In accordance with the memorandum, the
restrictions of the SAM that were in place for inmate Ozsusamlar
are no longer in effect.

Attachment

cc: Regional Director

CONFIDENTIAL MEMORANDUM
LAW ENFORCEMENT SENSITIVE



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

*Colorado Consolidated Legal Center*                    *Florence, CO 81226*

May 14, 2008

MEMORANDUM FOR  KATHLEEN M. KENNEY, ASSISTANT DIRECTOR/GENERAL
                COUNSEL, GENERAL COUNSEL AND REVIEW DIVISION

THROUGH:        Michael K. Nalley, Regional Director, North Central Region

FROM:           R. Wiley, Warden

SUBJECT:        **Annual Review of Special Administrative Measures**
                **OZSUSAMLAR, Osman, Register Number 53271-054**

As you are aware, the Special Administrative Measures (SAM) for the above-referenced
inmate will be reviewed for extension on or about June 14, 2008. In accordance with
Institutional Supplement FLM 5321.07(3)E, H-Unit Programs, an annual review of the
inmate's SAM and overall adjustment at this institution was conducted. We obtained
recommendations from staff and the inmate concerning the SAM and current conditions
of confinement. In addition, staff reviewed requests, grievances, and/or administrative
remedies submitted by inmate Ozsusamlar throughout the year; disciplinary information
from throughout the year; correspondence to/from inmate Ozsusamlar; types of
educational materials requested; types of leisure materials requested; and participation
in the various programming offered by the institution.

During the course of this review, we were informed that the United States Attorney's
Office for the Southern District of New York (USAO) and the Federal Bureau of
Investigation (FBI) determined that the circumstances which warranted the SAM for
inmate Ozsusamlar no longer exist. We were further informed that the SAM for inmate
Ozsusamlar would not be renewed. The USAO and FBI are preparing the necessary
paperwork for the SAM to be removed.



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

Office of the Warden                    *Florence, CO 81226*

May 16, 2008

MEMORANDUM FOR  OSMAN OZSUSAMLAR, REGISTER NUMBER 53271-054

FROM:              R. Wiley, Warden

SUBJECT:           **Vacation of Special Administrative Measures**

The purpose of this memorandum is to notify you that the Federal Bureau of Prisons received notification that the Special Administrative Measures (SAM) imposed on you are vacated.  The restrictions of the SAM that were in place for you are no longer in effect.

Received: ~~May~~ June __4__, 2008

Osman Ozsusamlar
Register Number 53271-054

SEP 2006

**U.S. DEPARTMENT OF JUSTICE**                          FEDERAL BUREAU OF PRISON

| From: (Warden/Superintendent) | Facility | Date |
|---|---|---|
| R. Wiley, Warden | ADX Florence, CO | September 22, 2008 |

| Inmate's Name | Register No. |
|---|---|
| OZSUSAMLAR, Osman | 53271-054 |

To: (Designations and Sentence Computation Center Administrator)

   Rebecca Tamez, DSCC Administrator

\_\_\_\_  Transfer to: _____

       Apply Management
\_\_\_\_  Variable(s)Greater Security _____

  X   Update Management Variable Expiration Date.  (New      Recommend N/A

1.  Inmate's Medical Status

    Healthy or Simple Chronic Care

2.  Institution Adjustment (Include a brief description of the inmate's adjustment during this
    period of incarceration with emphasis on recent adjustment.)

    05/31/2007 - Threatening Bodily Harm (203)

3.  Rationale for Referral.  (For Mariel Cuban Detainees, include availability of community
    resources and status of INS review process in this section.)

    Inmate Ozsusamlar's custody classification form was recently updated.  He is scored as a
    Low Security level inmate with Maximum Custody.  He arrived at ADX Florence on November 26,
    2007, as an Initial Designation. On September 18, 2007, Ozsusamlar was sentenced to 188
    months and 3 years supervised release for Conspiracy to Commit Murder For Hire, Murder For
    Hire, and Conspiracy to Commit Extortion.  While housed at MDC New York, Ozsusamlar
    attempted to organize and arrange for the killing of five FBI agents, two prosecutors, two
    defense attorneys, a case reporter, and a forensic specialist.  Due to continued safety and
    security concerns, we are requesting the extension of his Greater Security management
    variable.

| 4a.  Parole Hearing Scheduled: | Yes XX No | b.  If yes, when |
|---|---|---|

5.  Note any past or present behavior and/or management/inmate concerns.

    N/A

6.  BP337/BP338 Discrepancies.

    None.

Staff have checked the following SENTRY Programs to ensure that they are correct and current:
      Inmate Profile                  CIM Clearance and Separatee Data
      Inmate Load Data                Custody Classification Form
      Sentence Computation            Chronological Disciplinary Record

| Prepared by: (Case Manager) | Unit Manager Signature |
|---|---|
| T. Sudlo, | M. Collins, Unit Manager, |

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of "CRP RV DT" to indicate
the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

*(This form may be replicated via WP)*                    *This form replaces EMS-409 of DEC 99*

EMS-409.051 REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE CDFRM
SEP 2006
U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| From: //S//<br>Charles A. Daniels, Warden | Facility<br>USP Florence, Colorado | Date<br>October 30, 2010 |
|---|---|---|

| Inmate's Name<br>OZSUSAMLAR, Osman | Register No.<br>53271-054 |
|---|---|

To: (Designations and Sentence Computation Center Administrator)
Jose A. Santana, DSCC Administrator        ATTN: DSCC Designations

____  Transfer to: _____

____  Apply Management Variable    Greater Security

_X_  Update Management Variable Expiration Date.  (New Date):    10-30-2011

1.   Inmate's Medical Status


2.   Institution Adjustment (Include a brief description of the inmate's adjustment during this
     period of incarceration with emphasis on recent adjustment.)

During a recent Program Review inmate Ozsusamlar's Custody Classification Form was reviewed
which indicates he currently scores as a Low Security inmate with Maximum Custody, with the
Management Variable of Greater Security that expired on October 9, 2010.  Review of inmate
Ozsusamlar's central file reveals inmate Ozsusamlar was sentenced to 188-months for Conspiracy
to Commit Murder for Hire, Murder for Hire and Conspiracy to Commit Extortion.  While housed at
MDC New York, inmate Ozsusamlar attempted to organize and arrange the killing of five Federal
Bureau of Investigation Agents, two Prosecutors, two Defense Attorney's a Case Reporter, and a
Forensic Specialist.  Based on the serious nature of inmate Ozsusamlar's instant offense and
conduct during trial, his Unit Team believes inmate Ozsusamlar requires the supervision of a
high security environment, and therefore, continues to require a Greater Security Management
Variable.

3.   Rationale for Referral.  (For Mariel Cuban Detainees, include availability of community
     resources and status of INS review process in this section.)


| 4a.  Parole Hearing<br>Scheduled: | Yes _ X_ No | b.  If yes,<br>when |
|---|---|---|

5.   Note any past or present behavior and/or management/inmate concerns.


6.   BP337/BP338 Discrepancies.

There are no discrepancies between his BP337 and BP338.

Staff have checked the following SENTRY Programs to ensure that they are correct and current:
    Inmate Profile                       CIM Clearance and Separatee Data
    Inmate Load Data                     Custody Classification Form
    Sentence Computation                 Chronological Disciplinary Record

| Prepared by: B. Janusz, Case Manager | G. Lyde, Unit Manager |
|---|---|

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of "CRP RV DT" to indicate
the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

*(This form may be replicated via WP)*              *This form replaces EMS-409 of DEC 99*



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
9 *Administrative Maximum Security Institution*
: *High Security Institution*
9 *Medium Security Institution*
9 *Minimum Security Institution*

---

*Office of the Warden*                    *Florence, CO 81226*

September 16, 2011

MEMORANDUM FOR   MICHAEL K. NALLEY, REGIONAL DIRECTOR
                 NORTH CENTRAL REGION

ATTENTION:       PETER POTTIOS, CORRECTIONAL PROGRAMS
                 SPECIALIST, NORTH CENTRAL REGION

FROM:            Charles A. Daniels
                 Warden

SUBJECT:         **Request for Redesignation**
                 **OZSUSAMLAR, Osman**
                 **Register Number 53271-054**

1.               **Rationale for Redesignation:**  Inmate Ozsusamlar has
                 completed the final phase of the Pre-Transfer Program at the
                 United States Penitentiary (USP) Florence, Colorado, and is
                 eligible for transfer consideration to a lesser security institution.
                 Since arriving in the Pre-Transfer Program, inmate Ozsusamlar
                 has completed five classes.  He is housed in Delta/B Unit at
                 USP Florence and has requested to be transferred to another
                 institution.  Inmate Ozsusamlar has requested to be transferred
                 to USP Allenwood, Pennsylvania, USP Coleman, Florida, or
                 USP Atwater, California.  He has the Central Inmate Monitoring
                 assignments of Separation and Threat to Government Officials.

2.               **Proposed Transfer Code:** 308; Lesser Security.

3.               **CIM Assignment:** Separation and Threat to Government
                 Officials.

4.               **Release Destination:** Inmate Ozsusamlar has a legal
                 residence in Paterson, New Jersey.

5.               **Medical Status:** Inmate Ozsusamlar is assigned to regular duty

Request for Redesignation
Ozsusamlar, Osman
Register Number 53271-054
Page 2

status with Care 1 and Care1-Mental Health.

6.     **Does Inmate Concur With Transfer:** Yes.

7.     **Institution Recommended:** USP Allenwood, Pennsylvania, USP Coleman, Florida, or USP Atwater, California.

8.     **Mode of Transportation:** N/A.

    **Additional Pertinent Information:** Inmate Ozsusamlar is a 39-year-old, High Security inmate with Maximum Custody. He is currently serving a 188-month sentence for Conspiracy to Commit Murder for Hire, Murder for Hire and Conspiracy to Commit Extortion. On August 2006, inmate Ozsusamlar was convicted of Conspiracy to Commit Murder, Murder For Hire, and Conspiracy to Commit Extortion. While housed at the Metropolitan Detention Center in Brooklyn, New York, inmate Ozsusamlar attempted to engineer a new set of murders aimed primarily at the federal law enforcement agents and prosecutors who handled his case. Inmate Ozsusamlar recruited an inmate to organize and arrange for the killing of five FBI agents, two prosecutors, two defense attorneys, the case court reporter, and the forensic specialist. The recruited inmate then began cooperating with authorities regarding the proposed killings. Accordingly, Special Administrative Measures were imposed and inmate Ozsusamlar was transferred to ADX Florence, Colorado, and placed in the Special Security Unit.

9.     **PRIOR INSTITUTIONS OF CONFINEMENT**

    **MCC New York (10-07-2005 to 03-15-07):** Inmate Ozsusamlar was initially on holdover status at this institution pending sentencing. He maintained clear conduct during this time.

    **MDC Brooklyn, New York (03-15-07 to 11-08-07):** Inmate

EMS-409.051 **REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE** CDFRM
SEP 2006

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| From:<br>Paul Copenhaver, Warden | Facility<br>USP Atwater | Date<br>July 19, 2013 |
|---|---|---|

| Inmate's Name<br>OZSUSAMLAR, Osman | Register No.<br>53271-054 |
|---|---|

To: Jose A. Santana,
    Designations and Sentence Computation Center Administrator

___X___ Transfer to:  Any Appropriate Facility via code 308- Lesser Security

___X___ Apply Management Variable(s)  Greater Security (V)

_____ Update Management Variable Expiration Date.  (New Date):

1.  Inmate's Medical Status

Inmate Ozsusamlar is classified as regular duty status with no medical restrictions.  He is cleared for Food Service work.  There are no medical problems that would preclude him from transfer.

2.  Institution Adjustment (Include a brief description of the inmate's adjustment during this period of incarceration with emphasis on recent adjustment.)

Inmate Ozsusamlar arrived at USP Atwater on November 29, 2011, as a Lesser Security transfer from ADX Florence.  While there he completed the final phase of the Pre-Transfer Program.  Since his arrival, he has successfully completed multiple educational courses.  These courses include: Circles, Understanding the Universe, Parenting by Heart DVD, ACE Constitutional Law, Commercial Drivers License, Challenge Program, and ACE Auto Sales.  He is currently participating in the Inmate Financial Responsibility Program.  Also, he has maintained clear institutional conduct.

3.  Rationale for Referral.  (For Mariel Cuban Detainees, include availability of community resources and status of INS review process in this section.)

Inmate Ozsusamlar is a 9-point "Low" security level inmate serving a 188-month sentence for Conspiracy to Commit Murder for Hire, Murder for Hire and Conspiracy to Commit Extortion.  Inmate Ozsusamlar has displayed favorable institutional adjustment, which includes good work evaluations and participation in classes since arriving to USP Atwater.  The unit team is requesting inmate Ozsusamlar be transferred to any appropriate facility closest to his release residence in Paterson New Jersey, as it will allow him to receive visits and maintain contact with his immediate family.

| 4a.  Parole Hearing Scheduled:    Yes    X No | b.  If yes,<br>    when: |
|---|---|

5.  Note any past or present behavior and/or management/inmate concerns.

Inmate Ozsusamlar incurred an incident report for Threatening Bodily Harm, Code 203, during his incarceration.

6.  BP337/BP338 Discrepancies.

There are two discrepancies between the BP-337 and BP-338.  The BP-337 reflects public safety factor (PSF) of sentence length, however, BP-338 for (PSF) of sentence length has been removed due to the passage of time.  The BP-337 reflects violence, less than five years minor; however, the BP-338 has been updated to reflect violence, five to ten years minor due to an incident report he incurred for Threatening Bodily Harm, Code 203, on May 22, 2007.

Staff have checked the following SENTRY Programs to ensure that they are correct and current:

    Inmate Profile                     CIM Clearance and Separatee Data
    Inmate Load Data                   Custody Classification Form
    Sentence Computation               Chronological Disciplinary Record

| Prepared by:<br><br>D. Paniagua, Case Manager | Unit Manager Signature<br><br>A. Gardea, Unit Manager |
|---|---|

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of "CRP RV DT" to indicate the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

(This form may be replicated via WP)                    This form replaces EMS-409 of DEC 99

```
   POMAK  606.00 *        MALE CUSTODY CLASSIFICATION FORM      *     06-07-2018
PAGE 001 OF 001                                                       07:00:59
                              (A)  IDENTIFYING DATA
REG NO..: |53271-054             FORM DATE: 05-02-2018       ORG: DSC
NAME....: OZSUSAMLAR, OSMAN

                                 MGTV: GRTR SECU
PUB SFTY: GRT SVRTY,ALIEN        MVED: 07-04-2019
                              (B)  BASE SCORING
DETAINER: (0) NONE              SEVERITY........: (7) GREATEST
MOS REL.: 14                    CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE              VIOLENCE........: (3) 5-10 YRS MINOR
VOL SURR: (0) N/A               AGE CATEGORY...: (2) 36 THROUGH 54
EDUC LEV: (0) VERFD HS DEGREE/GED  DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                              (C)  CUSTODY SCORING
TIME SERVED.....: (5) 76-90%    PROG PARTICIPAT: (2) GOOD
LIVING SKILLS...: (2) GOOD      TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE      FAMILY/COMMUN..: (4) GOOD


                    --- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE  SEC TOTAL  SCORED LEV MGMT SEC LEVEL  CUSTODY  CONSIDER
+12  +21    -5        +7       LOW        MEDIUM           IN      DECREASE


G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```